UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

LISA M. HALL,

      Plaintiff,

   - against -

NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

      Defendant.

----------------------------------X

**MEMORANDUM & ORDER**

06-CV-2908 (KAM) (LB)

MATSUMOTO, UNITED STATES DISTRICT JUDGE:

Plaintiff Lisa Hall ("plaintiff" or "Hall") brings this action alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000, *et seq.* ("Title VII") and New York State Executive Law § 296 ("NYSEL").[1] (*See generally*, Doc. No. 1, Complaint ("Compl.") at 1; Doc. No. 27, Supplemental Complaint ("Suppl. Compl.") at 2.) Plaintiff alleges that she was discriminated against because of her race, gender, and age,[2] and retaliated against for filing complaints of discrimination. (*See* Compl. at

---

[1] Plaintiff commenced this action *pro se* on June 9, 2009 and filed a "Supplemental Complaint" on September 17, 2007. On November 17, 2007, an attorney filed a notice of appearance on plaintiff's behalf. (Doc. No. 31.) Plaintiff's attorney did not thereafter move to amend plaintiff's pleadings. Plaintiff has not alleged a violation of the New York City Human Rights Law, Administrative Code § 8-107, and the court does not presume that plaintiff intended to do so.

[2] Although plaintiff alleges age discrimination, plaintiff's pleadings do not indicate the statutes under which plaintiff brings her age discrimination claim. (*See, e.g.*, Compl. at 1.)

3.) Plaintiff alleges that defendant New York City Department of Transportation ("defendant" or "DOT") failed to promote her, denied her overtime opportunities, scrutinized her work, and subjected her to a hostile work environment. (*Id.; see also* Suppl. Compl. at 1-2.)

Defendant now moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of plaintiff's action. For the reasons set forth herein, defendant's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1, are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

Plaintiff is an African-American female who was born in 1962 and began working for defendant in March 2000. (Doc. No. 49, Defendant's Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶¶ 2-3.) Plaintiff is currently and at all times relevant to this action a provisional letterer (sign painter) and works in DOT's Maspeth, Queens facility. (*Id.* at ¶ 3.) As a provisional employee, plaintiff serves at will and was not required to pass any examination to obtain her position. (Doc. No. 52,

Declaration of Daniel Chiu ("Chiu Decl."), Ex. C, Deposition of
Lisa Hall on May 4, 2007 ("Pl. Dep.") at 7-8.)

**A. Alleged Hostile Remarks and Conduct**

Plaintiff testified that she was subjected to
discriminatory comments beginning in March 2000. (Def. 56.1
Stmt. ¶ 5; Pl. Dep. at 41.) According to plaintiff, she was
told in March 2000 by David Leschke, DOT's Director of Maspeth
Central Operations, that "I don't know where you came from, but
you may not have some of the abilities or skills of the men to
do the work or to get the work done." (Pl. Dep. at 41; Def.
56.1 Stmt. ¶ 19.) Plaintiff further testified that later that
year, Anthony Spagnuolo, plaintiff's supervisor from 2000
through 2003, told plaintiff that she had a "funny way of making
signs for a girl[,]" "may not be able to lift the signs because
[she] is a girl" and did "not make signs like Henry Chin[,]" a
male employee of the DOT. (Pl. Dep. at 120; Def. 56.1 Stmt. ¶
10.) According to plaintiff, Spagnuolo also told her that she
was a "spy" because she had recorded her co-workers' activities
in her daily work reports and that she was "getting the guys in
trouble[.]" (Pl. Dep. at 121-22.) Further, plaintiff testified
that in 2000, she overheard David Misla, a Traffic Device
Maintainer ("TDM") with DOT, state that he wanted to "mount" and
"get with" plaintiff. (*Id.* at 117-18.)

Plaintiff also alleges that between 2000 and 2001, she "had to deal with physical items being thrown" at her. (Doc. No. 59, Declaration of Lisa Hall ("Pl. Decl.") ¶ 8.) Plaintiff states that her co-workers "would often have tennis ball fights" and that during these fights, tennis balls were thrown in her direction "in an attempt to threaten and harass" her. (*Id.*)

Plaintiff asserts that she also experienced gender discrimination in 2003. (*See* Def. 56.1 Stmt. ¶ 8.) Plaintiff testified that in 2003, she was told by David Ramos, a TDM and the shop steward for traffic device maintainers at the Maspeth facility, that DOT could not install a women's bathroom on the first floor of the facility where plaintiff worked until 12 to 15 women were working on the first floor. (Pl. Dep. at 116-118.) Plaintiff testified that she and a "senior citizen female" both "campaigned for a bathroom" on the first floor and were told by their union that at least 12 to 15 female employees had to work there before a bathroom could be installed. (*Id.* at 82-83.) Plaintiff was directed to place her request in writing. (*Id.* at 83.) Ultimately, a men's bathroom on the first floor was converted into a women's bathroom. (*Id.*) Plaintiff testified that she and her female co-worker volunteered to "maintain the appearance and quality" of the bathroom and bought cleaning supplies and mops (*id.* at 84), "not as a condition of

having the bathroom" but because "it's something we chose to do" (*id.* at 85).

Additionally, plaintiff testified that Director Leschke objectified plaintiff as a female when he allegedly used the word "pee" referring to urination, because plaintiff believed that the word "'pee' . . . is a feminine form of 'piss.'" (*Id.* at 80-81.) Plaintiff also testified that Acting Art Room Supervisor Jay Wenz called plaintiff a "douche bag" in November 2003, and that he repeated this comment in April 2004, November 2004 and January 2005. (Def. 56.1 Stmt. ¶ 17; Pl. Dep. at 86-87, 142.) Plaintiff further testified that when she was called a "douche bag" in April 2004, Leschke laughed and failed to "curb that type of language or attitude at the time." (Pl. Dep. at 86.) Additionally, plaintiff testified that in April 2004, Leschke attempted to "attack" her "with a set of sign plates" that plaintiff had "just made and left for him." (Pl. Dep. at 72-73.)

Plaintiff asserts that Director Leschke continued to discriminate against her in 2004 on the basis of her gender. (*See* Def. 56.1 Stmt. ¶ 19.) Plaintiff testified that she approached Leschke to complain that Jay Wenz had allegedly attempted "to physically attack" plaintiff after he was dissatisfied with her work. (Pl. Dep. at 87.) In response, Leschke allegedly told plaintiff that Wenz had done nothing

wrong and that Wenz was "love[d]." (*Id.* at 88.) According to
plaintiff, Leschke told plaintiff that she was "cold[,]" "rude"
"soft" and "a girl[,]" and that she "may not have some of the
abilities to do the work being that [she is] a girl." (*Id.* at
88.)

Plaintiff asserts that she experienced race
discrimination in 2004. (*See* Def. 56.1 Stmt. ¶ 13.)
Specifically, plaintiff testified that in April 2004, John Reda,
a supervisor at the Maspeth facility, repeated a comment
purportedly made by Director Leschke comparing plaintiff to
Omarosa Manigault-Stallworth, a participant on the television
program "The Apprentice," whom plaintiff described as "the
villain[.]" (*Id.* ¶ 13; Pl. Dep. at 63-64, 124-125.) Plaintiff
believed that she was compared to Ms. Manigault-Stallworth
because plaintiff is African American and perceived as a villain
amongst her colleages. (*See* Pl. Dep. at 64; *see also* Pl. Decl.
¶ 11.) Plaintiff does not claim that Mr. Reda made any other
discriminatory comments. (Def. 56.1 Stmt. ¶ 14.) Plaintiff
states, however, that "supervisors" said "things like 'I saw
your puss on T.V.'" (Pl. Decl. ¶ 11.)

Plaintiff asserts that she "had to deal with physical
unwarranted touching." (Pl. Decl. ¶ 7.) Plaintiff asserts that
on September 30, 2004, she "was physically shoved by Mr. Wenz."
(*Id.*) In addition, plaintiff testified that on December 10,

6

2004, she was "assaulted" by Jay Wenz. (Pl. Dep. at 151; *see also* Deposition of Lisa Hall on April 1, 2008 (Pl. Suppl. Dep.") at 77.) Specifically, plaintiff testified that Wenz pushed a colleague, Al Meyers, to break up a conversation between plaintiff and Meyers, and that Meyers then collided with plaintiff. (Pl. Dep. at 137.) Plaintiff states that this occurred "for no apparent reason whatsoever." (Pl. Decl. ¶ 7.) Plaintiff also states that Wenz "waved a tightened fist at me, like he was going to hit me." (*Id.*) On another occasion, Wenz also shoved plaintiff "out of the way" when she was in the darkroom speaking with a colleague so that Wenz "could beat up Peter Levine." (Pl. Dep. at 137.)

Plaintiff further asserts that she was discriminated against because of her age. (Compl. at 3.) Plaintiff testified that she was asked about her age twice during her employment with DOT. (*See* Pl. Dep. at 92-93.) Specifically, plaintiff testified that she was asked about her age on employment forms she was requested to complete when she commenced employment with DOT. (*Id.* at 92.) Additionally, plaintiff testified that in 2004, DOT blacksmith Frank Cotnick, who never supervised plaintiff, asked plaintiff about her age "out of the blue." (*Id.*) Plaintiff responded, "in my forties" and some unidentified person replied, "she's over 21." (*Id.*) Plaintiff testified that aside from these two instances, there were no

other comments about her age that she found discriminatory.
(*Id.* at 93.)  Plaintiff, however, also testified that she was
told to "grow up" by Wenz and Leschke.  (*Id.* at 80, 86.)

Plaintiff testified that in 2005, she experienced both
gender and race discrimination.  Specifically, plaintiff
testified that Jay Wenz stated in April 2005 that plaintiff
lived with "mixed-race people" (Pl. Dep. at 141) and, on July 28
2005, described plaintiff as "trouble" because she "had a
lawsuit against the city." (*Id.* at 127.)  Additionally,
plaintiff testified that in October 2005, Director Leschke
called her a "fucking cunt." (*Id.* at 74.)  Plaintiff states
that when she complained to Leschke about this language, he
allegedly responded, "If you have a problem with the way things
work at Maspeth, then you can be shipped back to where you came
from." (Pl. Decl. ¶ 11.)  Plaintiff "took this as a direct
comment" about her race and wondered whether Leschke "was . . .
thinking about shipping [her] back to Africa[.]" (*Id.*)
Plaintiff testified that aside from the October 2005 instance,
Leschke did not again refer to her as a "cunt." (Pl. Dep. at
77.)  No one else at DOT referred to plaintiff in this manner.
(*See id.* at 78.)

Plaintiff also testified that in 2005, she felt
threatened when Wenz brought to work a gun concealed in a box
marked "Remington . . . Product Gun[.]" (*Id.* at 131.)  Plaintiff

testified that Wenz turned the box in her direction so that she could read the box, while she was seated on a bench with several co-workers. (*Id.;* Pl. Decl. ¶ 12.) According to plaintiff, Wenz boasted that he was a "hunter." (Pl. Decl. ¶ 12.) Plaintiff alleges that Wenz once stated sought her out and said "I'm a hunter. I hunt people. Is Lisa [Hall] in the booth?" (Pl. Decl. ¶ 12.)

Plaintiff further testified that on January 26, 2006, she and a Caucasian colleague, Thomas Ferstler, were nearly "run over" by a speeding truck driven by a co-worker, Jason Brennan, at the Maspeth facility. (Pl. Dep. at 74-75, Pl. Suppl. Dep. at 77-78.) As a result, plaintiff attempted to obtain a form to file an incident report but was told by a supervisor that he did not have a form and that because plaintiff was not hurt and "truck wasn't hurt[,]" "there's nothing to talk about." (Pl. Dep. at 167.) Plaintiff obtained the form and filed an incident report the following day alleging that Brennan had traveled at "an excessive rate of speed" toward plaintiff and Ferstler and "continued speeding" into the Maspeth facility. (Chiu Decl., Ex. T, Security Incident Report.) The report does not claim that the incident was motivated by plaintiff's race or gender. (*See id.*) DOT investigated the incident and substantiated the allegation that Brennan drove at an excessive rate of speed.

(Def. 56.1 Stmt. ¶ 30.)  As a result, Brennan was issued a
verbal reprimand.  (*Id.*)

Later in 2006, plaintiff overheard Director Leschke
make a derogatory comment concerning another woman.  According
to plaintiff, Leschke commented that a delivery person "should
have played with his wife's pussy a little bit more to make her
happy."  (Pl. Dep. at 40-41.)  Plaintiff testified that she
heard Leschke use the term "puss" or "pussy" a "few times . . .
sprinkled here and there . . . ."  (Pl. Dep. at 80.)

Plaintiff also testified that in 2006, she overheard
two male co-workers talking about her.  (*See* Pl. Dep. at 107-
108.)  Plaintiff testified that she overheard a male co-workers
discussing that she "likes Mandingo dick."  (*Id.* at 108.)
Plaintiff believed this to be a discriminatory comment about her
race and gender, however, she "did not address" the issue.  (*See
id.* at 108-109.)

Plaintiff claims that Gino Magenta, Jr., plaintiff's
supervisor since 2004, videotaped her without her consent and
despite her protest.  (Pl. Decl. ¶ 13; Def. 56.1 Stmt. ¶ 25.)
Plaintiff believes that she was videotaped because of her race
or gender.  (Suppl. Pl. Dep. at 28.)  By contrast, Mr. Magenta
states that he "brought a video camera to work to videotape
[his] workplace to show [his] friends and family [his] job site
and what [he] did at work."  (Doc. No. 51, Declaration of Gino

Magenta, Jr. ("Magenta Decl.") ¶ 3.)  Mr. Magenta also states
that he did not bring the video camera to work to videotape
plaintiff.  (*Id.* ¶ 4.)

## B. Alleged Disparate Treatment

Plaintiff claims she has been denied the opportunity
to become a permanent, non-provisional letterer, despite having
received an overall rating of "good" on her 2000-2006
performance evaluations.  (Pl. Decl. ¶¶ 15, 17.)  Plaintiff
states that she applied for a permanent letterer position by
offering her résumé to her supervisor who, according to
plaintiff, declined to accept the résumé and said "You already
have a job."  (*Id.* ¶ 17.)  Plaintiff does not indicate whether
she followed the proper procedure required to apply for the
permanent letterer position.  Plaintiff's Complaint,
Supplemental Complaint and Charge of Discrimination before the
Equal Employment Opportunity Commission ("EEOC") do not assert
that she was denied promotion to the permanent letterer
position.

Plaintiff also alleges that she was unlawfully denied
overtime opportunities as a result of discrimination.  (*See*
Compl. at 5.)  Plaintiff states that she was told that overtime
was available only to "senior" and "permanent" letterers.  (Pl.
Dep. at 34-35; Pl. Decl. ¶ 17.)  Plaintiff testified that three
permanent letterers are over age 40, and that there are four

permanent letterers and four provisional letterers. (Pl. Dep.
at 10-12, 34-35.) Plaintiff further testified that she received
overtime assignments (Pl. Dep. at 34), and states that certain
offers of overtime employment allegedly were "sham[s]" because
they were made at the "last minute" and did not provide
plaintiff with "enough notice to be available" for the overtime
assignment (Pl. Decl. ¶ 17).

Plaintiff also contends that she was subject to
"excessive scrutiny." (*See* Doc. No. 55, Plaintiff's Memorandum
of Law ("Pl. Mem.") at 9.) Plaintiff states that she was "told
to keep notes regarding everything that affected [her] daily
work." (Pl. Decl. ¶ 10.) Although plaintiff's counsel argues
that "[n]one of the white male employees were asked to keep such
a log" (Pl. Mem. at 10) (citing Pl. Decl. ¶ 10), plaintiff does
not so allege. Plaintiff states that her note taking made her
co-workers "suspicious" of her. (Pl. Decl. ¶ 10.)

Plaintiff also alleges that she was "written up,
reprimanded, and otherwise punished for transgressions that were
manufactured" by her supervisors. (Pl. Decl. ¶ 20.) In support
of her allegation, plaintiff testified that she was accused of
altering a leave request form. (Pl. Dep. at 27-31; Pl. Decl. ¶
16.) As a result, plaintiff was docked one day's pay for an
absence without official leave ("AWOL"). (Pl. Decl. ¶ 16; Pl.
Dep. at 27-29.) Plaintiff testified that she was required to

appear at a hearing concerning the matter and the decision to dock plaintiff's pay initially was upheld. (Pl. Dep. at 30-32.) Plaintiff testified that following an appeal of this determination, her pay was reinstated. (*Id.* at 32-33.) Plaintiff testified that "[n]o other employees were marked AWOL" and subject to a hearing. (*Id.* at 31.) The basis upon which plaintiff purports to have personal knowledge of other employees' attendance and disciplinary records is not apparent from plaintiff's testimony.

Plaintiff further asserts that the placement of a security camera in her work space was discriminatory. (Pl. Decl. ¶ 14.) Plaintiff states that the camera was positioned toward her to permit Leschke to "keep an eye" on her through a television monitor because she is a woman. (*Id.; see also* Pl. Dep. at 50.) Plaintiff testified that the monitor was removed from Leschke's office in 2000, allegedly after Leschke was observed by a "cleaning woman" to be masturbating in his office. (*See* Pl. Dep. at 45-46.) According to plaintiff, a security monitor was replaced in Leschke's office in or about 2004. (*Id.* at 51.) Plaintiff testified that the use of cameras throughout the Maspeth facility has steadily increased since 2004. (*Id.* at 51-52.)

Plaintiff also testified that she was treated differently in 2007 because she was not permitted to use a

photocopier on the second floor of the Maspeth facility. (*See* Pl. Dep. at 76-77.) According to plaintiff, she was told that employees who do not work in the second floor office in which the photocopier was placed were not permitted to use the machine. (*Id.*) Plaintiff did not indicate whether other employees were similarly prohibited from using the photocopier.

**C. Alleged Retaliation**

Plaintiff filed a complaint of discrimination with DOT's EEO Office on March 5, 2001. (Def. 56.1 Stmt. ¶ 35.) In her complaint, plaintiff states that she was subjected to discriminated based on gender, as well as sexual harassment in the form of "lewd comments." (Chiu Decl., Ex. N, Complaint of Discrimination, at 1.) Plaintiff also indicated that she was subjected to discrimination based on her "height."[3] (*Id.*)

Plaintiff claims that Patrick Ambrogio, DOT's Deputy Director of Signs and Markings, retaliated against her on several occasions. (*See* Pl. Dep. at 160.) Specifically, plaintiff claims that Ambrogio retaliated against her by denying her review of the incident involving Jason Brennan's alleged attempt to "run over" plaintiff in a speeding truck. (*See id.*) Additionally, plaintiff claims that Ambrogio denied her a copy of her performance evaluation in May 2005. (*Id.; see* Def. 56.1

---

[3] Plaintiff has not raised any claim in the present action arising from her height.

Stmt. ¶ 39.) Plaintiff received a copy of her 2005 performance evaluation after she requested it from a personnel coordinator. (Def. 56.1 Stmt. ¶ 39.) Indeed, plaintiff's 2005 performance evaluation indicates that it was received on May 2, 2005. (Chiu Decl., Ex. E.) Plaintiff also claims that she was retaliated against by Ambrogio in April 2006 when he provided to plaintiff an allegedly defective "zip disk and CD" which were required for plaintiff's work assignment. (Pl. Dep. at 160; Def. 56.1 Stmt. ¶ 39.) Plaintiff acknowledges that not receiving her 2005 performance evaluation and receiving an allegedly defective zip disk and CD did not affect her job performance or cause a loss of a job benefit. (Def. 56.1 Stmt. ¶ 39; Pl. Dep. at 162-163.)

**D. DOT's Investigation**

DOT maintains an anti-discrimination policy and complaint procedure for the redress of discriminatory behavior. (Def. 56.1 Stmt. ¶ 43l Chiu Decl., Ex. Q, Equal Employment Opportunity Policy.) Plaintiff was given a copy of DOT's EEO policy and was aware of the complaint procedures. (Def. 56.1 Stmt. 44; Pl. Dep. at 167-168.)

In response to plaintiff's March 5, 2001 complaint of discrimination, DOT's EEO Office conducted an investigation into plaintiff's claims. (Def. 56.1 Stmt. ¶ 45.) Following the investigation, on March 21, 2001, DOT's EEO Office conducted a training seminar for all TDMs, letterers and Maspeth facility

supervisors, on acceptable and unacceptable behavior in the workplace. (*Id.* ¶ 46; *see* Chiu Decl., Ex. P, EEO Report and Recommendation.) Following the training seminar, the conduct that plaintiff found objectionable ceased. (Def. 56.1 Stmt. ¶ 47.) In June 2001, DOT's EEO Office issued a report in which it found that it could not corroborate any of plaintiff's discrimination and harassment claims. (*Id.* ¶ 49; Chiu Decl., Ex. P.)

Plaintiff testified that the alleged harassment recommenced approximately one week after the training session and "increased," however, plaintiff did not file another complaint with the EEO Office because her March 1, 2001 complaint was not substantiated and because the EEO Office was not receptive of her complaints. (*See* Def. 56.1 Stmt. ¶ 48; Pl. Dep. at 173-175.) Plaintiff testified that once the alleged harassment recommenced, she complained to Madeline Nazario of the DOT's EEO Office who, according to plaintiff, told her to "[t]ake it elsewhere." (*Id.* at 174-175.) Plaintiff testified that Ms. Nazario told her that "the men didn't do anything to you and you know it. You can take your case elsewhere." (*Id.* at 176.)

## PROCEDURAL HISTORY

On July 8, 2005, plaintiff filed a charge of discrimination with the EEOC (the "EEOC Charge"). (Def. 56.1

16

Stmt. ¶ 36.) Plaintiff's EEOC Charge alleges discrimination based on race, sex, age and retaliation. (Doc. No. 1, Charge of Discrimination.) The EEOC Charge alleges that the first act of discrimination took place in February 2001 and that the discrimination is "continuing."[4]

On March 10, 2006, the EEOC concluded that it was unable to determine whether defendant violated any anti-discrimination laws and issued a Notice of Dismissal and Suit Rights (the "Notice"). (Chiu Decl., Ex. O, Dismissal and Notice of Rights.) The Notice instructed that any lawsuit "must be filed" within 90 days of receipt of the Notice. (*Id.*; Def. 56.1 Stmt. ¶ 37.)

On June 9, 2006, plaintiff filed a *pro se* Complaint initiating this action. On the *pro se* Complaint form, plaintiff checked the lines for discrimination based on race, gender and age, and retaliation. (Compl. at 3.)

**DISCUSSION**

**A. Summary Judgment Standard**

The court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a

---

[4] Plaintiff's EEOC filing also alleged discrimination based on "other," specifically, "talent for position and use of industry skills gained."

matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation and internal quotation marks omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

        The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.*, 242

F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not rest "merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion.").

"Employment discrimination cases raise special issues on summary judgment." *Kenney v. New York City Dep't of Educ.*, No. 06-CV-5770, 2007 U.S. Dist. LEXIS 77926, at *7 (S.D.N.Y. Oct. 22, 2007). Specifically, employment discrimination cases that involve a dispute concerning the "employer's intent and motivation," may not be suitable for summary judgment. *Id.; see Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The Second Circuit has noted, however, that "we went out of our way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (internal quotation marks and citations omitted); *see also Holcomb*, 521 F.3d at 137 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment").

**B. Hostile Work Environment Claims**

To establish a claim of hostile work environment, a plaintiff must establish that (1) her workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his work environment and (2) a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The legal standard applied to a hostile work environment claim under the NYSEL is the same as that applied under Title VII. *See Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 623 (S.D.N.Y. 2009) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (N.Y. 2004)).

The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22). The first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive. *See Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001).

In determining whether a workplace is objectively hostile, the court evaluates the "record as a whole" and assesses the "totality of the circumstances." *Wright-Jackson v. HIP Health Plan*, No. 07-CV-1819, 2010 U.S. Dist. LEXIS 14751, at *26 (S.D.N.Y. Feb. 19, 2010) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)); *Harris*, 510 U.S. at 23. In particular, the court examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "cumulatively in order to obtain a realistic view of the work environment." *Schwapp*, 118 F.3d at 111. "[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks and citation omitted

Moreover, "[r]acial . . . epithets need not be directed at an employee to contribute to a hostile work environment, because 'evidence of harassment of [other members of the protected group], if part of a pervasive or continuing pattern of conduct, [is] surely relevant to show the existence of a hostile work environment.'" *Little v. National Broad. Co.*,

210 F. Supp. 2d 330, 389 (S.D.N.Y. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)); *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Remarks targeting members of other minorities . . . may contribute to the overall hostility of the working environment for a minority employee."); *Cf. Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 186 (2d Cir. 2001) (holding that Title VII's prohibition against hostile work environment discrimination affords no claim to a person who experiences it solely "by hearsay" where alleged hostility was "out of [plaintiff's] . . . sight and regular orbit").

### 1. Timeliness of Hostile Work Environment Claims

Plaintiff alleges that she has been subjected to a hostile work environment based on her gender, race and age since March 2000. Defendant argues in a footnote that plaintiff's allegations of discriminatory hostility which occurred prior to September 11, 2004, 300 days before plaintiff filed her July 8, 2005 Charge with the EEOC, may be barred on statute of limitations grounds. (Doc. No. 50, Def. Mem. at 4 n.3.) The court is mindful that, for a Title VII hostile work environment claim arising in New York to be timely, a plaintiff must file the charge of discrimination with the EEOC within 300 days of the allegedly discriminatory act. *See* 42 U.S.C. § 2000e-5(e); *Baroor v. New York City Dep't of Educ.*, No. 09-1924-cv, 2010

U.S. App. LEXIS 1399, at *3 (2d Cir. Jan. 21, 2010) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998)); *Harris v. City of New York*, 186 F.3d 243, 247 n.2 (2d Cir. 1999) (300-day rule applies in New York State).

      Notwithstanding the 300-day limitations period, if a plaintiff files an EEOC charge that is timely with respect to any incident of discrimination, under the "continuing violation" doctrine, all acts contributing to the hostile work environment claim, even if they are beyond the 300-day period, are "treated as timely." *See Baroor*, 2010 U.S. App. LEXIS 1399, at *3; *see also Kaur v. New York City Health & Hosps. Corp.*, No. 07-CV-6175, 2010 U.S. Dist. LEXIS 15455, at * 25-26 (S.D.N.Y. Feb. 19, 2010). "Whereas a plaintiff alleging 'discrete discriminatory acts' including 'termination, failure to promote, denial of transfer, or refusal to hire' will not trigger the continuing-violations doctrine, a plaintiff bringing a hostile work environment claim will fall into the [continuing violation] exception if 'all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.'" *Drew v. Plaza Constr. Corp.*, 09-CV-2129, 2010 U.S. Dist. LEXIS 8699, at *19 (S.D.N.Y. Jan. 28, 2010) (quoting *National R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002)).

"Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period." *Kaur*, 2010 U.S. Dist. LEXIS, at *26 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (internal quotation marks omitted)). "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* (quoting *Morgan*, 536 U.S. at 112).

Here, defendant does not argue that certain instances of alleged discrimination are "discrete acts" that fall beyond the 300-day limitations period. Instead, without any explanation, defendant contends that "[p]laintiff's hostile work environment claim may further by [sic] limited by her failure to timely file a Charge of Discrimination with the EEOC" and that "claimed discriminatory acts that occurred prior to September 11, 2004 would be barred on statute of limitations grounds." (Def. Mem. at 4 n. 2.) Because defendant has failed to explain the basis upon which any alleged discrimination can be considered "discrete acts" of discrimination for statute of limitations purposes, the court declines to conclude that any of plaintiff's claims are time barred.

## 2. Severity of Alleged Hostility

Plaintiff has proffered specific evidence related to her gender-based hostile work environment claims sufficient to raise a genuine issue of material fact as to whether her workplace was permeated with discriminatory harassment that was sufficiently severe or pervasive as to alter the conditions of her work environment. Plaintiff testified that she was subjected to verbal hostility beginning in 2000. As previously discussed, plaintiff testified that between 2000 and 2001, her superiors, Anthony Spagnuolo and David Leschke, commented that plaintiff did not possess the same abilities as her male colleagues. (*See* Pl. Dep. at 41, 120.) Additionally, plaintiff testified that in 2000, she overheard a co-worker state that he wanted to "mount" and "get with" her. (*Id.* at 117-118.) Plaintiff further testified that on four occasions, she was referred to as a "douche bag" by Jay Wenz (*see* Def. 56.1 Stmt. ¶ 17; Pl. Dep. at 86-87, 142), and that in 2004, Leschke called plaintiff "soft" and a "girl" (Pl. Dep. at 88-89). Plaintiff also testified that in October 2005, Leschke referred to plaintiff as a "fucking cunt." (Pl. Dep. at 74.)

Additionally, plaintiff testified that women were objectified in the workplace. Specifically, plaintiff testified that she overheard Leschke state that a delivery person "should have played with his wife's pussy a little bit more to make her

happy." (Pl. Dep. at 40-41.) Plaintiff also testified that she
heard Leschke repeatedly use the term "puss" or "pussy" when
referring to plaintiff and other women. (*See* Pl. Dep. at 80.)

Moreover, plaintiff testified that her physical safety
was threatened by her male co-workers on several occasions.
(*See, e.g.*, Pl. Decl. ¶ 8 (tennis ball fights); Pl. Dep. at 197,
151; Pl. Decl. ¶ 7 (pushing incidents); Pl. Dep. at 131
("Remington" gun box incident); Pl. Dep. at 72-73 ("attack" with
"sign plates"); Pl. Decl. ¶ 7 ("tightened fist" incident).)
Although plaintiff's gender was not specifically referenced
during any of these incidents, "facially neutral" acts and
comments may be included among the totality of the circumstances
that the court may consider in reference to plaintiff's hostile
work environment claim. *See Rodriguez v. City of New York*, 644
F. Supp. 2d 168, 190 (E.D.N.Y. 2008) (quoting *Alfano v.
Costello*, 294 F.3d 365, 378 (2d Cir. 2002)). When these acts
are viewed together with gender-specific comments to which
plaintiff was allegedly subjected, there are sufficient material
issues of fact to preclude summary judgment on plaintiff's
gender-based hostile work environment claims.

Moreover, given the "interplay" between evidence of
gender-based hostility and racial hostility, summary judgment on
plaintiff's race-based hostile work environment claims is not
warranted. *See Cruz*, 202 F.3d at 572 (observing that a jury

could conclude that a human resources manager's "racial
harassment exacerbated the effect of his sexually threatening
behavior and vice versa").  Specifically, the undisputed
evidence establishes that plaintiff was referred to as
"Omarosa," a female African-American television personality whom
plaintiff described as a "villain."  (Pl. Dep. at 63-64, 124-
125; Pl. Suppl. Dep. at 59, 68.)  Additionally, plaintiff
overheard a co-worker state that plaintiff "likes Mandingo dick"
(Pl. Dep. at 107-108) and that she lived with "mixed-race
people" (*Id.* at 141).  When viewed together with incidents of
alleged physical threats and gender-based hostility, a jury
could find from these racially-hostile statements that plaintiff
was subjected to a hostile work environment based on her race.

By contrast, plaintiff has failed to raise a genuine
issue of material fact regarding any age-based hostile work
environment claim, assuming that such a claim was pled.
Plaintiff testified that she was asked about her age twice
during her employment with DOT, once on an employment form
plaintiff was requested to complete when she commenced
employment with DOT. (*See* Pl. Dep. at 92-93.)  Plaintiff also
testified that in 2004, she was asked about her age "out of the
blue."  (*Id.*)  From these undisputed facts, no reasonable jury
could find that plaintiff was subjected to a hostile work
environment based on her age.  Accordingly, to the extent

plaintiff has raised a hostile work environment claim based on her age, that claim is dismissed.

### 3. Imputation of Harassment on DOT

In addition to demonstrating the existence of a hostile work environment, to survive summary judgment, plaintiff must also establish some basis for imputing the objectionable conduct to the DOT. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher*, 524 U.S. 775)). Where the harassment is attributed to a supervisor, the court must examine "whether the supervisor's behavior culminated in a tangible employment action against the employee." *Petrosino*, 385 F.3d at 225 (internal quotation marks and citation omitted). A "tangible employment action" requires an act which the employer ratified or approved, *see Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999), and is therefore limited to "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Ellerth*, 524 U.S. at 761. Here, as discussed below, plaintiff did not suffer any tangible employment action as a result of the alleged discriminatory hostility.

Where no tangible employment action occurs, the employer will still be liable unless it establishes that "(a) it exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. at 765. The court may consider an employer's failure to conduct an adequate investigation or to undertake an appropriate response as evidence of discrimination or liability. *See Sassaman v. Gamache*, 566 F.3d 307, 314-15 (2d Cir. 2009).

With respect to the first element, which requires that the DOT demonstrate that it exercised reasonable care to prevent and correct harassing behavior, the parties do not dispute that the DOT maintained an anti-discrimination policy or that plaintiff was aware of the same. (*See* Def. 56.1 Stmt. ¶ 35; Chui Decl., Ex. Q, EEO Policy.) Indeed, plaintiff filed a complaint with DOT's EEO Office on March 5, 2001. (Def. 56.1 Stmt. ¶ 35.)

Instead, plaintiff contends that the DOT's response to her March 5, 2001 complaint was inadequate and that she was rebuffed in her attempt to file further complaints. (*See* Pl. Decl. ¶ 18.) Specifically, in her declaration in opposition to defendant's instant motion, plaintiff states that she attempted

to address additional incidents of alleged harassment and was told to take her complaint "elsewhere" and that her "case has been closed!" (*Id.*)

Defendant contends that plaintiff's declaration is inconsistent with her deposition testimony insofar as plaintiff testified that she did not file another complaint with DOT's EEO Office because her March 5, 2001 complaint was not substantiated. (*See* Def. Mem. at 9.) The court disagrees. Plaintiff testified that following her March 5, 2001 complaint, the alleged harassment "quieted down mildly, and then it picked up and increased." (Pl. Dep. at 173.) Plaintiff further testified that when the alleged harassment recommenced, she complained to Madeline Nazario of the DOT's EEO Office who, according to plaintiff, told her to "[t]ake it elsewhere." (*Id.* at 174-175.) Plaintiff testified that Ms. Nazario told her that "the men didn't do anything to you and you know it. You can take your case elsewhere." (*Id.* at 176.)

At a minimum, plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to the reasonableness of the DOT's response to plaintiff's complaints of continuing hostility and discrimination. Moreover, plaintiff's testimony regarding the DOT's alleged response to her additional complaints raises a triable factual issue as to whether plaintiff unreasonably failed to take advantage of any

preventative or corrective opportunities provided by the DOT.
Accordingly, defendant's motion for summary judgment as to
plaintiff's race and gender-based hostile work environment
claims is denied.

**C. Disparate Treatment Claims**

Plaintiff's claims of unlawful disparate treatment
brought pursuant to Title VII and the NYSEL are analyzed under
the three-step burden shifting framework established in
*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See
Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981);
*Weinstock*, 224 F.3d at 42 n.1 (employment discrimination claims
under the NYSEL are subject to the same standard of proof as
claims under Title VII).

Initially, the plaintiff bears the burden of
establishing a *prima facie* case of discrimination.  To establish
a *prima facie* case, the plaintiff must show that (1) she is a
member of a protected class, (2) she was qualified for his job,
(3) she suffered an adverse employment action, and (4) such
adverse employment action occurred under circumstances giving
rise to an inference of discrimination.  *McDonnell-Douglas*, 411
U.S. at 802-803.  The Second Circuit has "characterized this
burden as '*de minimis*:' it is 'neither onerous, nor intended to
be rigid, mechanized or ritualistic.'"  *Beyer v. County of*

*Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001)).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-803. The employer's "burden is one of production, not persuasion . . . and involves no credibility assessment of the evidence." *Pathare v. Klein*, No. 06-CV-2202, 2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y. Sept. 12, 2008) (citations omitted). At this stage, the employer "must present a clear explanation for the action." *Id.* (citation omitted).

If the employer meets its burden, the plaintiff must present evidence to show that the employer's reason is a mere pretext for an impermissible discriminatory motive. *McDonnell-Douglas*, 411 U.S. at 804; *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). In the summary judgment context, this means the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision . . . is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *See*

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d
1219, 1225 (2d Cir. 1994).

Here, plaintiff claims that because of her race and
gender, she was denied the opportunity to become a non-
provisional employee, denied overtime opportunities and
subjected to excessive scrutiny.  There is no dispute as to the
first element of the *McDonnell Douglas* analysis – that plaintiff
is a member of a protected class because she is an African-
American woman.

### 1. Promotional Opportunities

Plaintiff alleges that she was denied the opportunity
to be promoted from a non-provisional letterer to a permanent
letterer.  (Pl. Decl. ¶ 17.)  As defendant points out,
plaintiff's claim that she was denied the opportunity to become
a non-provisional, permanent letterer was raised for the first
time in her opposition to the summary judgment motion.  (Doc.
No. 53, Defendant's Reply Memorandum of Law ("Def. Reply Mem.")
at 7-8.)  Plaintiff's failure-to-promote claim should thus be
dismissed because she failed to raise this claim in her EEOC
Charge, Complaint and Supplemental Complaint.  *See Smith v. Long
Island Univ.*, No. 03-CV-2991, 2007 U.S. Dist. LEXIS 38379, at
*19 (E.D.N.Y. May 25, 2007) ("A district court only has
jurisdiction to hear Title VII claims that are either included
in an EEOC charge or are based upon subsequent conduct to the

EEOC charge which is 'reasonably related' to that alleged in the EEOC charge") (quoting *Butts v. New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397 F.2d 1397, 1401 (2d Cir. 1993).

Even assuming, *arguendo*, that the claims asserted in plaintiff's EEOC Charge and pleadings can be read to allege a failure-to-promote claim, such a claim must nevertheless be dismissed.  Defendant points out that to become a permanent letterer, plaintiff is required, at a minimum, to take a civil service examination the position.

The New York State Constitution provides that all "[a]ppointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable . . . ."  N.Y. CONST. art. V, § 6.  "Implementing this mandate, New York's Civil Service Law requires that candidates for competitive positions first pass an examination demonstrating that they have the skills required for a the corresponding job.  All passing candidates are then placed on a ranked eligibility list from which, as demand dictates, permanent appointments to open positions are made."  *As-Salaam v. New York City Dep't of Parks & Rec.*, No. 02-CV-5646, 2007

U.S. Dist. LEXIS 53584, at *12 (E.D.N.Y. July 24, 2007) (citing N.Y. CIV. SERV. LAW §§ 50, 52, 56, 61).

Although a failure-to-promote is clearly an adverse employment action, plaintiff has failed to proffer any evidence that a permanent position was available or that she ever took a civil service examination to be qualified for a permanent letterer position.  Instead, plaintiff states that she applied for a permanent letterer position by offering a copy of her résumé to her supervisor.  (Pl. Decl. ¶ 17.)  Thus, plaintiff's own recitation of the facts establishes that she failed to satisfy the requirements for permanent competitive appointment to the civil service letterer position and, as a matter of New York law, plaintiff was not "qualified" for the position. Plaintiff has thus failed to satisfy the third *McDonnell Douglas* factor, requiring that she be "qualified" for the position to which she applied.

Nor is there any evidence to indicate that plaintiff was denied the permanent letterer position under circumstances giving rise to an inference of discrimination, as required by the fourth *McDonnell Douglas* factor.  Specifically, plaintiff has failed to proffer admissible evidence that anyone was promoted to the permanent letterer position without first passing the mandated civil service examination.  Accordingly, plaintiff has failed to satisfy her *de minimis* burden to

establish a *prima facie* disparate treatment case of race, gender or age discrimination based on defendant's alleged failure to promote her to a permanent letterer position.  Plaintiff's failure-to-promote claims are therefore dismissed.

### 2. Overtime Opportunities

Plaintiff alleges that she was denied overtime opportunities as a result of unlawful discrimination.  (*See* Pl. Decl. ¶ 17.)  Plaintiff asserts that she was told by her supervisors that overtime opportunities were available only to permanent letters, and "believe[s that] this was just an excuse" her supervisor provided "to give [overtime opportunities] to other DOT personnel." (*Id.; see* Pl. Dep. at 34-35.)  As previously mentioned, plaintiff testified that she received overtime assignments.  (Pl. Dep. at 34.)  Plaintiff asserts that certain offers of overtime opportunities were "sham[s]" because they were made at the "last minute" and did not provide plaintiff with "enough notice to be available" for the overtime assignment (Pl. Decl. ¶ 17).  Citing paragraph 17 of plaintiff's Declaration, plaintiff's counsel asserts that "non-African American female employees are given at least a few days notice before they have to decide whether to take advantage of available overtime hours." (Pl. Mem. at 9) (citing Pl. Decl. ¶ 17.)  Plaintiff's Declaration makes no such claim, nor does

plaintiff set forth any basis in personal knowledge to support such an assertion. (*See* Pl. Decl. ¶ 17.)

Defendant contends that plaintiff did not suffer an adverse employment action and that any adverse employment action did not occur under circumstances giving rise to an inference of discrimination. (*See* Def. Mem. at 14.) Specifically, defendant argues that plaintiff did not suffer an adverse employment action because she admitted receiving overtime opportunities. (*See* Pl. Dep. at 34; Pl. Decl. ¶ 17.) Defendant also argues that plaintiff cannot establish an inference of discrimination because she admitted that she (i) received overtime opportunities, (ii) was told that when she was denied such opportunities it was because she was a provisional letterer, and (iii) women and individuals older than she received overtime opportunities. (Def. Mem. at 14.)

Based on the undisputed evidence, the court concludes that plaintiff has failed to establish a *prima facie* case of discrimination regarding her denial of overtime claims. Plaintiff cannot establish that she suffered an adverse employment action—namely, the denial of overtime opportunities based on her race, gender or age—because she concedes receiving offers of overtime employment. (Pl. Dep. at 34-35; Pl. Decl. ¶ 17.) Plaintiff's assertion that certain offers of overtime employment were "sham[s]" because they made at the "last minute"

(Pl. Decl. ¶ 17) is insufficient to raise a genuine factual dispute because plaintiff has failed to establish, through admissible evidence, that other employees were treated preferentially with respect to overtime opportunities. Thus, plaintiff has also failed to proffer admissible evidence indicating that she suffered any adverse employment action under circumstances giving rise to an inference of discrimination. Plaintiff has therefore failed to satisfy her *de minimis* burden to establish a *prima facie* disparate treatment case of race, gender or age discrimination based on defendant's alleged failure to provide overtime opportunities. Accordingly, such claims are dismissed.

### 3. Excessive Scrutiny

Plaintiff alleges that she was subjected to "excessive scrutiny" as a result of unlawful discrimination. (*See* Pl. Mem. at 9-11.) Citing paragraph 10 of plaintiff's Declaration, plaintiff's counsel argues that plaintiff was required to maintain a log of her daily activities while "[n]one of the white male employees were asked to keep such a log." (*Id.* at 10.) Plaintiff's Declaration makes no such assertion, nor does plaintiff set forth any basis in personal knowledge to support such an assertion. (*See* Pl. Decl. ¶ 10.) Additionally, plaintiff asserts that a security camera was positioned in her work area and that she was "written up, reprimanded, and

otherwise punished for transgressions that were manufactured by [her] supervisors."  (Pl. Decl. ¶ 20.)

Even assuming that plaintiff was subjected to excessive scrutiny, in view of the undisputed facts, the court concludes that plaintiff has failed to establish that she suffered any adverse employment action as a result of any alleged increased scrutiny.  Even assuming that plaintiff was scrutinized because of her race, gender or age, she testified that she received an overall rating of "good" on her 2000-2006 performance evaluations.  (Pl. Decl. ¶¶ 15, 17.)   Further, even assuming that plaintiff was subjected to criticism and reprimands, where, as here, such conduct did not lead to materially adverse employment consequences, it is not considered actionable disparate treatment.  *See Dauer v. Verizon Communs. Inc.*, 613 F. Supp. 2d 446, 461 (S.D.N.Y. 2009) (observing that "[c]ourts in this circuit have found that reprimands . . . and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation," and [plaintiff] offers no evidence of such negative results here") (citation omitted); *see also Weeks v. New York State*, 273 F.3d 76, 86 (2d Cir. 2001) ("[i]t hardly needs saying that a criticism of an employee . . . is not an adverse employment action" where there is no evidence that the criticism had any negative ramifications for the

employee), *abrogated on other grounds*, *Morgan*, 536 U.S. at 106-114; *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) ("micro-management" and "excessive scrutiny" were not adverse employment actions, particularly where plaintiff's only evidence of disparate treatment was "her own perception that she was treated differently"); *Morrison v. Potter*, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("being called into supervisor's office to discuss work issues" is not an adverse employment action, even if it causes the employee embarrassment or anxiety). Nor was the placement of a camera in plaintiff's work space a materially adverse employment action. *See Figueroa v. City of New York*, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("Being followed [and observed] by supervisors is not a materially adverse employment action"). "Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Id.* (internal quotation marks and citation omitted).

Plaintiff further alleges that she was charged one day's pay for being AWOL after she previously requested the day off. (*See* Suppl. Pl. Dep. at 27-31.) Plaintiff testified that she grieved a determination finding her AWOL and had her pay reinstated. (*Id.* at 32-33.) Even assuming that plaintiff suffered an adverse employment action, there is no evidence

40

other than plaintiff's own speculation that other similarly-situated employees were treated differently. (*See* Pl. Dep. at 31.) Nor is there any evidence that plaintiff was charged a day's pay because of her gender, race or age, or in retaliation for protected activity.

To the extent plaintiff claims that DOT discriminated against her by failing to provide a women's bathroom on the first floor of the Maspeth facility, plaintiff's testimony establishes that a first floor men's bathroom was converted into a women's bathroom upon the request of plaintiff and a female colleague. (Pl. Dep. at 82-83.) In any event, "an employer's failure to provide same-sex bathrooms is not an adverse employment action." *Dauer*, 613 F. Supp. 2d at 460.

Even assuming, *arguendo*, that plaintiff experienced an adverse employment action as a result of enhanced scrutiny, plaintiff has failed to present any admissible evidence that similarly-situated employees were not treated in the same manner. Indeed, there is no admissible evidence that non-African-American male employees, or employees younger than plaintiff, were also not scrutinized, reprimanded or "written up." Thus, plaintiff has failed to satisfy her *de minimis* burden to establish a *prima facie* disparate treatment case of race, gender or age discrimination based on defendant's alleged

excessive scrutiny and reprimands.  Accordingly, such claims are

dismissed.

**D. Retaliation**

> Title VII makes it

> an unlawful employment practice for an employer
> to discriminate against any of his employees . .
> . because he has opposed any practice made an
> unlawful employment practice by this subchapter
> or because he has made a charge, testified,
> assisted or participated in any manner in an
> investigation, proceeding or hearing under this
> subchapter.

42 U.S.C. § 2000e-3(a).  A plaintiff's retaliation claim is

examined applying the same *McDonnell Douglas* burden-shifting

framework utilized for disparate treatment claims.  *See Terry v.

Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).  Retaliation claims

under the NYSEL, like hostile work environment claims, are

governed by the same standards as federal claims under Title

VII.  *See Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d

597, 609 (2d Cir. 2006).

A plaintiff makes a *prima facie* showing of retaliation

by establishing (1) participation in a protected activity known

to the defendant, (2) an employment action disadvantaging the

plaintiff, and (3) a causal connection between the protected

activity and the adverse employment action.  *Richardson v.

Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d

Cir. 2008).  Only a "minimal" and "*de minimis*" showing is

necessary to establish a *prima facie* retaliation claim at the summary judgment stage. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* discrimination case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). Once a plaintiff has satisfied her *prima facie* burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back to plaintiff to demonstrate that the reasons proffered by defendant were a pretext for retaliatory animus based upon protected Title VII activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *EEOC v. Thomas Dodge Corp.*, No. 07-CV-988, 2009 U.S. Dist. LEXIS 24838, at *38 (E.D.N.Y. Mar. 25, 2009).

There is no dispute that plaintiff's March 5, 2001 complaint to DOT's EEO Office satisfies the first requirement that plaintiff participate in a protected activity known to the defendant. There is also no dispute that, for the purposes of defendant's instant motion, plaintiff's March 5, 2001 complaint to DOT's EEO Office constitutes protected activity under Title

VII because, viewing the evidence in the light most favorable to plaintiff, it appears that plaintiff had a "good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII" when she lodged complaints regarding the purported discrimination. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (holding that, "[t]o prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII," but only that he held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law"); *see also Reed v. A. W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding that the plaintiff's internal complaints regarding co-workers' offensive comments satisfied the first prong of the *prima facie* analysis); *Galimore v. City Univ. of New York*, 641 F. Supp. 2d 269, 287 (S.D.N.Y. 2009) (same).

Plaintiff claims that following her March 2001 EEO complaint, she was retaliated against in several ways. First, plaintiff claims that DOT's Deputy Director Patrick Amgrogio retaliated against her by denying her review of a January 26, 2006 incident involving Jason Brennan's alleged attempt to "run over" plaintiff and a Caucasian male co-worker in a speeding truck. (*See* Pl. Dep. at 160.) This allegation is belied by plaintiff's testimony that the matter was investigated and

Brennan was reprimanded. (Def. 56.1 Stmt. ¶ 30.) In any event, plaintiff has failed to proffer any evidence indicating that Ambrogio's alleged denial to investigate the matter was causally connected to plaintiff's March 2001 EEO complaint.

Second, plaintiff claims that Ambrogio denied her a copy of her performance evaluation in May 2005. (*Id.; see* Def. 56.1 Stmt. ¶ 39.) It is, however, undisputed that plaintiff received a copy of her 2005 performance evaluation after she requested it from a personnel coordinator. (Def. 56.1 Stmt. ¶ 39.) Moreover, there is no evidence that plaintiff's alleged failure to timely receive her 2005 performance evaluation disadvantaged her in any way or that it was related to her protected activity. Plaintiff has again failed to present any evidence indicating that Ambrogio's alleged failure to provide plaintiff with her performance evaluation in 2005 is causally related to her March 2001 EEO complaint.

Third, plaintiff claims that she was retaliated against by Ambrogio in April 2006 when he provided to plaintiff an allegedly defective "zip disk and CD" which was required for plaintiff's work assignment. (Pl. Dep. at 160; Def. 56.1 Stmt. ¶ 39.) As previously mentioned, there is no evidence that plaintiff was disadvantaged by receiving the allegedly defective zip disk and CD or that this incident affected her job performance or caused a loss of a job benefit. (*See* Def. 56.1

45

Stmt. ¶ 39; Pl. Dep. at 162-163.)  Nor is there any evidence indicating that Ambrogio's provision on an allegedly defective zip disk and CD in April 2006 is causally connected to plaintiff's March 2001 EEO complaint.

Fourth, plaintiff asserts that she experienced increased hostility as a result of her March 5, 2001 complaint to DOT's EEO Office and July 8, 2005 Charge of Discrimination to the EEOC.  (*See* Pl. Mem. at 12.)  Plaintiff acknowledges that "it is difficult to discern which instances [of harassing behavior] [were] motivated solely by discriminatory animus and which [were] also motivated by a desire to retaliate against Ms. Hall for filing her claim of discrimination."  (*Id.*)

Plaintiff's retaliatory hostile work environment claims is evaluated under the same standard that "is applied generally to hostile work environment claims regarding the severity of the alleged conduct." *See King v. Interstate Brands Corp.*, No. 02-CV-5470, 2009 U.S. Dist. LEXIS 36594, at *51 (E.D.N.Y. Apr. 29, 2009) (citations omitted); *see also White*, 548 U.S. at 60 (holding that an "adverse employment action" is one which would "dissuade [] a reasonable worker from making or supporting a charge of discrimination."); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) ("unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action").

The standard for establishing a hostile work environment is discussed above. "Where there is no direct evidence of such animus, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action." *King*, 2009 U.S. Dist. LEXIS 36594, at *57 (citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)).

The court has already determined that plaintiff has proffered sufficient evidence to raise a genuine issue of material fact as to whether the workplace was permeated with discriminatory harassment based on plaintiff's gender and race. Thus, the court must now determine whether there is sufficient evidence under the summary judgment standard to support a retaliatory hostile work environment claim based upon conduct that took place after plaintiff's March 5, 2001 complaint to the DOT's EEO Office and July 8, 2005 Charge to the EEOC.

To establish a causal connection between the protected activity and alleged retaliatory hostility, "some increase in the discrimination or harassment-either a 'ratcheting up' of the preexisting behavior, or new, additional forms of harassment-must occur for the employee to make out a viable retaliation claim." *Hall v. Parker Hannifan Corp.*, No. 08-CV-6033, 2009 U.S. Dist. LEXIS 108663, at *15 (W.D.N.Y. Nov. 20, 2009) (citation omitted); *see also Gregory v. Daly*, 243 F.3d 687, 690

(2d Cir. 2001) (holding that plaintiff adequately stated a retaliation claim based on her allegation that her supervisor's conduct significantly worsened after she complained about his sexual harassment and filed a lawsuit against him in state court).  If, however, "the discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory behavior."  *See Hall*, 2009 U.S. Dist. LEXIS 108663, at *15.

Here, plaintiff testified that her co-workers' and supervisors' harassment intensified and increased in frequency following plaintiff's March 2001 complaint to DOT's EEO Office. Specifically, plaintiff testified that following the DOT's investigation of her March 5, 2001 complaint, the alleged harassment ceased for approximately one week and subsequently "picked up and increased," and that she was rebuffed in her efforts to complain about increased hostility.  (Pl. Dep. at 173-75.)  Plaintiff also testified that she experienced several instances of alleged hostility that occurred shortly following her July 8, 2005 Charge to the EEOC.  (*See supra*, at 7-9.) Further, plaintiff testified that on July 28, 2005, twenty days after plaintiff's EEOC Charge, she overheard supervisor Jay Wenz tell a colleague that he "better watch out for that girl Lisa because she's trouble, she's dangerous, and Lisa has a lawsuit

against the city." (Pl. Dep. at 127.) When viewed in totality, the evidence is sufficient to satisfy plaintiff's minimal burden to establish a *prima facie* retaliation case.

Because plaintiff has established a *prima facie* retaliation case, defendant must articulate a legitimate, non-discriminatory basis for its action. *See Feingold*, 366 F.3d at 157. Defendant has failed to do so. Instead, defendant denies that the alleged hostility is sufficiently severe to establish a hostile work environment claim and that plaintiff was otherwise not retaliated against for her complaints of discrimination. (See Def. Reply Mem. at 1-2, 10.) Accordingly, summary judgment on plaintiff's retaliatory hostile work environment claim is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied with respect to plaintiff's hostile work environment and retaliatory hostile work environment claims under Title VII and the NYSEL, and granted with respect to the remainder of plaintiff's claims.  The parties shall participate in a telephone status conference on April 19, 2010 at 4:30 p.m., which plaintiff's counsel shall initiate.

SO ORDERED.

Dated: Brooklyn, New York
       March 30, 2010

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York